IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| KATHY COLEMAN HEATON,<br><br>      Plaintiff,<br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>      Defendant. | No. 1:21-CV-403 |

**REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

The claimant, Kathy Coleman Heaton, requests judicial review of a final decision of the Commissioner of Social Security Administration with respect to her application for disability-based benefits. This action is before the undersigned magistrate judge for review, hearing if necessary, and submission of a report with recommended findings of fact and conclusions of law.[1] For the reasons that follow, the undersigned finds that the administrative law judge's decision lacks reversible error and is supported by substantial evidence, and therefore affirms the decision denying benefits.

**I. JUDICIAL REVIEW**

United States district courts may review decisions of the Commissioner of the Social Security Administration. 42 U.S.C. § 405(g) (2020). The scope of judicial review is limited, however, to determining whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). When the Commissioner

---

[1] General Order 05-06 refers civil proceedings involving appeals from decisions of the Commissioner of Social Security Administration to magistrate judges serving the divisions where the cases are filed. *See also* 28 U.S.C. § 636(b)(1)(B) (2009) and E.D. TEX. CIV. R. CV-72 for the Assignment of Duties to United States Magistrate Judges.

applies proper law and the decision is supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also* 42 U.S.C. § 405(g).

Reviewing courts, therefore, give the Commissioner's decisions great deference. *Leggett,* 67 F.3d at 564. Courts may not re-weigh evidence, try issues *de novo*, or substitute their judgments for those of the Commissioner. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995). A court cannot reverse the Commissioner simply because the court might have decided the case differently in the first instance. *Elfer v. Texas Workforce Comm'n*, 169 F. App'x 378, 380 (5th Cir. 2006); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995) (stating that the court may not "substitute [its] judgment for that of the Secretary"). Rather, it is for the Commissioner to weigh evidence and resolve conflicts. *See Anthony*, 954 F.2d at 295; *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

When the Commissioner fails to apply correct principles of law, or when "substantial evidence"[2] does not support the Commissioner's decision, the governing statute authorizes a reviewing court to enter, upon the pleadings and the transcript of the record, a judgment modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. *See* 42 U.S.C. § 405(g). Thus, courts have power to remand for further administrative proceedings, or they may direct the Commissioner to award benefits without a rehearing. Ordinarily, courts remand for further administrative proceedings to address and cure deficiencies. *See, e.g., Newton v. Apfel*, 209 F.3d 448, 460 (5th Cir. 2000).

---

[2] "Substantial evidence" is a term of art meaning "more than a mere scintilla." *Biestek v. Berryhill,* 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Anthony v. Sullivan*, 954 F.2d at 292. Evidence is "substantial" when it is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. *Biestek,* 139 S. Ct. at 1154*; Richardson v. Perales*, 402 U.S. at 401; *Marcello v. Bowen*, 803 F.2d 851, 853 (5th Cir. 1986).

## II.  BACKGROUND

A    Procedural History

Heaton filed an application for supplemental social security disability income benefits on April 16, 2019, alleging that she became unable to work on March 1, 2018.[3]  (Tr. 23, 170.)  After the Commissioner denied her application initially and on reconsideration, Heaton requested an administrative hearing, which the administrative law judge ("ALJ") Benjamin Chaykin held telephonically on July 27, 2020.  (Tr. 23, 38, 134.)  In his decision dated August 24, 2020, ALJ Chaykin found Heaton was not disabled because she could perform work available in significant numbers in the national economy (cashier, ticket seller, or order caller). (Tr. 20-32.)  On June 1, 2021, the Appeals Council denied review of the ALJ Chaykin's decision (Tr. 1-6.)  Heaton then brought this action under 42 U.S.C. § 405(g).

B.    Personal Background

Heaton was forty-eight years old at the time ALJ Chaykin issued his decision.  (Tr. 30.) She has at least a high school education and no past relevant work.  (*Id.*)  Heaton testified that she earns $500 per month (plus $350 in rent proceeds) for collecting and recording rent payments from over thirty trailer park tenants.  (Tr. 25.)  She has a significant tobacco history, and in 2019 she reported that she drinks ten or more alcoholic drinks per day.  (Tr. 137) (one or more packs of cigarettes for 30 years); (Tr. 1132) (medical record that she chews tobacco);  (Tr. 1365).  ALJ Chaykin summarized her testimony from the hearing:

> The claimant alleged disability due to shortness of breath, vision problems, chest pain, and pain in her leg, right hand and lower back. She testified that she was able to do very little with her right hand due to poor recovery from a previous hand injury. She alleged having constant leg pain, which occasionally prevented her from driving. She additionally stated that she could only stand and walk for very brief periods due to her leg pain. The claimant endorsed shortness of breath

---

[3]    Heaton's record contains a prior administrative-level denial issued February 1, 2019.  (Tr. 84-94.)

during the day, requiring nebulizer and inhaler use multiple times per day, as well as back pain limiting her ability for exertion. She also alleged problems related to urinary frequency.

(Tr. 29.)

C. Administrative History and Appeal

ALJ Chaykin utilized the five-step sequential analysis model specified by regulations and approved by courts in reaching her decision denying Heaton's application.[4] At step one, ALJ Chaykin determined that Heaton has not engaged in substantial gainful activity since April 20, 2011 (the application date). (Tr. 225.) At step two, ALJ Chaykin found that Heaton had the following severe impairments: obesity; hypertension; polyneuropathy; coronary artery disease; peripheral artery disease; and diabetes mellitus. (Tr. 26.) In making this determination, ALJ Chaykin specifically mentioned a laundry list of 31 other impairments (including, *inter alia*, chronic obstructive pulmonary disease ("COPD"), asthma, and emphysema) that had not caused, or be expected to cause, more than minimal work-related limitation for at least 12 consecutive months. (*Id.*) At step three, he considered Heaton's potential for Listings-Level impairments (hypertension, diabetes, neurological disorders, and obesity) and determined that none were met.

---

[4] Pursuant to 20 C.F.R. § 404.1520(a)-(f), the five steps are generally as follows:

1. The Commissioner ascertains *whether an applicant currently engages in substantial gainful activity*. (If so, a finding of non-disability is entered, and the inquiry ends.)

2. The Commissioner determines *whether an applicant has a severe impairment or combination of impairments.* (If not, the inquiry ends, and a finding of non-disability is entered.)

3. The Commissioner determines *whether any severe impairment(s) equals or exceeds those in a Listing of Impairments, 20 C.F.R. Subpt. P, Appendix 1* ("the Listings"). (If so, disability is presumed, and benefits are awarded. If not, the analysis continues.)

4. The Commissioner determines *whether any impairment(s) prevents the claimant from engaging in regular previous employment*. (If so, a *prima facie* case of disability is established and the burden of going forward (to the fifth step) shifts to the Commissioner. *See Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987)).

5. The Commissioner determines *whether other work exists in the national economy which the applicant can perform*. (If so, the burden shifts back to the applicant to show he cannot perform the alternative labor. *See id.*; *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986)).

4

(*Id.*)  ALJ Chaykin determined that Heaton had the Residual Functional Capacity ("RFC") to perform light work except that she was limited to no exposure to dangerous hazards such as unprotected heights or dangerous machinery.  (Tr. 28.)  Thereafter, at step four, ALJ Chaykin found that Heaton had no past relevant work.  (Tr. 30.)  At step five, ALJ Chaykin found that Heaton was capable of performing jobs in the national economy, including cashier, ticket seller, and order caller.  (*Id.*)  He ultimately concluded that Heaton was not disabled through April 16, 2017.  (*Id.*)

### III.  POINT OF ERROR

Heaton raises three issues for review:

1. ALJ Chaykin erred at step three in failing to discuss, analyze, or refer to Listing 12.05 because of his failure to consider her public school records[5],

2. ALJ Chaykin's RFC finding is not supported by substantial evidence and results from legal error, and

3. ALJ Chaykin's step five finding that Heaton retains the ability to perform other work existing in the national economy is not supported by substantial evidence.

(Doc. 22, p. 1.)  The Commissioner responds that Heaton's first point of error is baseless, and that the step two and five assessments are supported by substantial evidence.

---

[5] Although Heaton frames this point of error as an attack on ALJ Chaykin's failure to address Listing 12.05 at step three, it actually challenges the failure to include borderline intellectual functioning at step two.  However at step two, ALJ Chaykin clearly recognized Heaton's alleged intellectual impairments and found that because they were based on a remote history and did not cause more than minimal limitations in her ability to perform basic mental activities, they were "nonsevere."  (Tr. 26.)

ALJ Chaykin was not required to analyze Heaton's mental impairments at step three if none were identified at step two.  If ALJ Chaykin had included mental impairments, borderline intellectual functioning, or mental retardation at step two, he would have been compelled to consider the "Paragraph B criteria" to determine whether she qualified for disability benefits under Listing 12.05 at step three.  Despite not making the step two finding, ALJ Chaykin still addressed the Paragraph B criteria.  Therefore, any alleged error at step two was harmless because ALJ Chaykin applied the relevant analysis and substantial evidence supports his decision, as discussed *infra.*

## IV. ALLEGED INTELLECTUAL DISORDER

The medical evidence of Heaton's alleged intellectual impairment is isolated and remote. She submitted primary and secondary public school records that document low I.Q. scores and below-average standardized test scores. (Doc. 22, p. 6) (citing Tr. 398) (full scale I.Q. score of 61 in 1985 when Heaton was 15 years old); (Tr. 295) (tests show that when she was in 12th grade, Heaton read at the 8th grade level and performed math skills at the 7th grade level). This is the sole evidence on which she relies to establish Listings Level intellectual impairment. Other than her school records, the administrative transcript does not contain any evidence of mental limitations and she has no evidence that she was ever diagnosed with or treated for an intellectual disorder.

Listing 12.05B provides the criteria used to determine when "[borderline intellectual functioning] is severe enough to preclude gainful activity." [6]   20 C.F.R., pt. 404, subpt. P, app. 1; *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010). The introductory paragraph of Listing 12.05 requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."   The diagnostic description therefore requires that a claimant demonstrate both subaverage general intellectual

---

[6]   In 2013, a revised version of Listing 12.05 went into effect which replaced the term "mental retardation" with "intellectual disability." *Peterson v. Comm'r of Soc. Sec.*, 552 Fed. Appx. 533, 536 n.1 (6th Cir. 2014). The substantive components of the listing remained unchanged. *See Hickel v. Comm'r of Soc. Sec.*, 539 Fed. Appx. 980, 982 n.1 (11th Cir. 2013). The terms "mental retardation" and "intellectual disability" can be used interchangeably because they refer to the same disorder. *See Talavera v. Astrue*, 697 F.3d 145, 148 n.2 (2d Cir. 2012); *Lorenz v. Berryhill*, No. 18-13793, 2020 WL 1818047, at *9 (E.D. Mich. Jan. 24, 2020).

functioning *and* deficits in adaptive functioning before age 22.[7] (*Id.*) Specifically, Listing 12.05B is satisfied by demonstrating:

> 1. Significantly subaverage general intellectual functioning evidence by a or b:
>
>> a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
>>
>> b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; *and*
>
> 2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>
>> a. Understand, remember, or apply information (see 12.00E1); or
>> b. Interact with others (see 12.00E2); or
>> c. Concentrate, persist, or maintain pace (see 12.00E3); or
>> d. Adapt or manage oneself (see 12.00E4); *and*
>
> 3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

---

[7] In *Durden v. Astrue*, the United States District Court for the Southern District of Texas provided an excellent definition of adaptive functioning:

> Although the SSA has not explicitly defined "deficits in adaptive functioning," Listing 12.00 does provide criteria for assessing the "severity" required by section (C) of some other mental impairments and by section (D) of Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). These criteria include "adaptive activities of daily living," (such as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office"), "social functioning" (including "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers") and "concentration, persistence, or pace" (defined as "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings"). Although it is not clear that the SSA intended these criteria to be synonymous with the term "deficits in adaptive functioning," some courts have considered these criteria when determining whether a claimant has the deficits in adaptive functioning required to meet Listing 12.05(C) because they overlap, to some extent, with the examples of adaptive functioning behaviors provided in the [Diagnostic and Statistical Manual of Mental Disorders–IV].

*Durden v. Astrue*, 586 F.Supp.2d 828, 834 (S.D. Tex. 2008) (internal citations omitted). The above definition demonstrates that a wide spectrum is used to evaluate adaptive functioning, and that the category can be subdivided in three areas: (1.) daily living, (2.) social functioning, and (3.) concentration, persistence and pace.

20 C.F.R., pt. 404, subpt. P, app. 1, § 12.05B. While Heaton is correct that ALJ Chaykin did not consider Listing 12.05 at step three, the decision clearly documents his discussion of alleged mental impairments at step two and the relevant criteria for establishing a Listings-Level intellectual disorder:

> The claimant alleged disability in part due to intellectual disability, noting a history of special education. The record does not contain any underlying diagnosis by an acceptable medical source concerning the claimant's reported low IQ scores. Moreover, these reported scores are very remote, and the record since the claimant's application date contains little evidence of related complaints, abnormalities on examination or treatment. As such, borderline intellectual functioning and intellectual disorder are not medically determinable impairments. However, even if they were considered to be medically determinable impairments based on remote history, they do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

(Tr. 26) (internal citations omitted). ALJ Chaykin also discussed the consideration of the four broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments at step three (20 CFR, Part 404, Subpart P, Appendix 1). He concluded:

> The first functional area is understanding, remembering or applying information. In this area, the claimant has no limitation. As noted, the record contains little evidence of mental health treatment or abnormalities. Since the application date, treatment notes reveal no memory loss or intellectual abnormality. The claimant testified that she was able to graduate with special education supports. Moreover, the claimant has worked part-time for many years in her trailer home community, collecting rent payments from 32 tenants, accounting for these payments, and submitting a log of such payments to the trailer park community owner. Therefore, overall, the record does not support any significant limitation in understanding, remembering or applying information.
>
> The next functional area is interacting with others. In this area, the claimant has no limitation. Treatment notes regularly indicate that the claimant was cooperative and interactive, with full orientation and normal mood and affect. Therefore, the record does not support any limitations in interacting with others.
>
> The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has no limitation. Treatment notes have not revealed any

>complaints of decreased concentration or confusion. Additionally, the claimant's aforementioned work activity is inconsistent with any significant limitations in concentrating, persisting or maintaining pace.  Nor did the claimant allege that she received special accommodation to perform this work due to intellectual limitations.  Therefore, the undersigned finds that the record does not demonstrate any limitation in concentrating, persisting or maintaining pace.
>
>The fourth functional area is adapting or managing oneself. In this area, the claimant has no limitation. Although Rakesh Shah, MD indicated that the claimant had poor insight as to the overall process of peripheral artery disease, this is not a statement concerning the claimant's psychiatric functioning. Psychological observations have noted appropriate mood and affect, with no obvious deficits in insight or judgment, and no complaints of agitation, confusion, hallucination, anxiety, self-injury, or sleep disturbance.  The claimant also testified that she could cook meals and help care for her adult son, who is deaf.  Overall, the undersigned finds that the record does not support psychological limitations with respect to adapting or managing oneself.

(Tr. 26-27) (internal citations omitted, but ALJ Chaykin makes multiple pin citations to treating medical records in support).

It is the undersigned's role is to determine whether the step three determination is supported by substantial evidence and without legal error.  Thus, Heaton must show that there is evidence reflecting that she satisfied Listing 12.05B, and no contrary evidence sufficient for a reasonable mind to accept existed.  The evidence cited by and relied on by ALJ Chaykin demonstrates that Heaton has *no* significant limitations in any of the four domains, and Heaton has failed to present credible evidentiary support that proves otherwise.  (Doc. 22, p. 5) (citing Tr. 26-27).  Moreover, the undersigned agrees with ALJ Chaykin that Heaton has demonstrated the mental ability to perform work—albeit at levels below "substantial gainful activity"—that shows she does not suffer from an intellectual disorder that would prevent her from sustaining the mental demands of employment.

Accordingly, the undersigned finds that ALJ Chaykin's discussion of Heaton's mental impairments at step two was adequate, and that no error was committed in not assessing Listing

12.05 at step three. *See e.g., Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 677 (6th Cir. 2009) (finding claimant's adaptive skills were not deficient as she cared for herself and her husband, cooked, washed clothes, shopped, managed her finances and used public transportation); *Muse v. Sullivan*, 925 F.2d 785, 789-790 (5th Cir.) (I.Q. score of 59 was properly discounted where, *inter alia*, claimant had work experience as a truck driver).

Finally, in his decision ALJ Chaykin noted "even if the claimant were limited to simple, routine, repetitive tasks and simple work-related decisions *due to borderline intellectual functioning or intellectual disorder*, the vocational expert at the hearing testified that the aforementioned jobs would remain without any change in numbers." (Tr. 31) (emphasis added). Therefore, even assuming *arguendo* that ALJ Chaykin failed to include intellectual disorders at steps two or three, Heaton does not demonstrate reversible error.

## VI.  SUBSTANTIAL EVIDENCE

Heaton contends that ALJ Chaykin's determination of her RFC relating to vision ability, obesity, respiratory complaints, and urinary incontinence is flawed and requires remand.[8] "Determining a claimant's residual functioning capacity is the ALJ's responsibility, and [s]he has the authority and duty to weigh the evidence and reach any conclusion supported by

---

[8] Again, although Heaton cloaks her point of error as an attack on ALJ Chaykin's RFC assessment, she actually challenges ALJ Chaykin's step two decision to find these impairments "not severe." An ALJ may properly conclude that an impairment is not severe only after expressly finding that it "is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Salmond v. Berryhill*, No. 17-10161, 2018 WL 3015052, at *3 (5th Cir. June 18, 2018) (citing *Stone*, 752 F.2d at 1101-03. Re-stated, an impairment is severe if it is anything more than a "slight abnormality" that "would not be expected to interfere" with a claimant's ability to work. *Id.*

An ALJ's mistake at step two is not subject to automatic reversal if the error was harmless. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021). Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached even if the ALJ did not err. *Id.*; *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (per curiam). The error is only harmless if the resulting limitations were ultimately included in the RFC assessment. *See Reliford v. Colvin*, No. H121850, 2013 WL 1787650, at *13 (S.D. Tex. April 25, 2013). Although Heaton's points of error challenge the step two assessment, she must also establish reversible error by not accounting for the limitations in the RFC assessment.

10

substantial evidence." *Gonzales v. Astrue*, 231 F. App'x 322, 324 (5th Cir. 2007) (per curiam) (citing *Ripley*, 67 F.3d at 557; *Holman v. Massanari*, 275 F.3d 43 (5th Cir. 2001) (per curiam)).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). The Commissioner, and not the courts, resolves conflicts in the evidence; thereafter, the Court may not "reweigh the evidence or try the issues *de novo*." *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995) (per curiam) (citing *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983) (per curiam)). Accordingly, the Court may not substitute its own judgment for the Commissioner's, and it may affirm only on the grounds that the Commissioner stated to support her decision. *Cole ex rel. Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) (per curiam).

A finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). Heaton carries the burden to produce objective medical evidence of a condition that could reasonably be expected to produce the symptoms complained of. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989.)

A. <u>Vision Impairment</u>

At step two, ALJ Chaykin included cataracts, thyroid eye disease, and dry eyes in the laundry list of conditions that he recognized but failed to include at step two because "the evidence indicates that these impairments were either acute and successfully treated in the short term, or else have not been particularly symptomatic during the relevant period, requiring little more than routine and/or conservative management." (Tr. 26.) In assessing her RFC, ALJ Chaykin considered Heaton's subjective "reports of visual problems" and referred to treatment

notes that "revealed complaints of blurry vision in October 2019, but good functional vision with glasses." (Tr. 29) (citing Tr. 1321, 1323, 1400-01, 1413).

Ironically, Heaton relies on the same evidence cited by ALJ Chaykin to support her claim of severe vision impairment, but her reliance is misplaced. Treatment notes indicate that Heaton attended regular diabetic exams, and that she reported blurry vision and watery, burning, and dry eyes in October 2019. (Tr. 1321, 1323.) The diagnosis provided was diabetes mellitus type 1.5; thyroid eye disease; dry eyes, bilateral; right posterior capsular opacification; pseudophakia of both eyes; and refractive error. (Tr. 1325.) In November 2019, a subsequent eye examination revealed that Heaton has a "cloudy posterior capsule that is causing decreased vision, which caused difficulty driving, reading and watching television." (Tr. 1356.) In November 2019, Heaton underwent a laser capsulotomy to alleviate the symptoms. (Tr. 1355.) The state agency medical consultants, James Wright, M.D., and Brian Harper, M.D., assessed RFC findings for light work, neither of which included any visual limitations. (Tr. 30, citing 99-106, 109-22.)

Despite Heaton's allegation to the contrary, the record lacks objective medical evidence demonstrating vision impairment following her laser capsulotomy. Furthermore, she testified that despite alleged impaired vision, she retains the ability to drive (Tr. 59), cook dinner (Tr. 69), maintain a payment ledger for the rent payment she collects from her thirty-plus neighbors that she emails to the owner every month (Tr. 67-68), and read a recipe closely enough to follow (with reading glasses). (Tr. 69.) Accordingly, the undersigned finds that ALJ Chaykin's assessment of her vision ability is supported by substantial evidence.

B.  Obesity

Heaton, who is 5 foot 2 inches tall and weighed 208 pounds in October 2019, challenges ALJ Chaykin's failure to include limitations associated with her obesity in the RFC assessment.

In support, she relies on subjective complaints of immobility (Tr. 56, 57, 69) and a prior administrative finding that she was prevented from performing more than a limited range of sedentary work. (Tr. 81) (decision dated February 1, 2019). ALJ Chaykin discussed her obesity at step three when he referenced S.S.R. 19-2p and concluded that:

> the claimant's obesity does not increase the severity of any co-existing or related impairments to the extent that the combination of the impairments meets the requirements of any listing. Nor is there any evidence of record that demonstrates the claimant's obesity itself medically equals the requirements of any listed impairment.

(Tr. 28.) The decision reflects that ALJ Chaykin clearly considered Heaton's obesity and concluded that the evidence does not support her alleged symptoms, and she is unable to produce any objective medical evidence to the contrary. Accordingly, the undersigned finds that ALJ Chaykin's decision as it relates to obesity is supported by substantial evidence.

    C.    <u>Respiratory and Cardiac-Related Complaints</u>

Heaton alleges that she has chronic obstructive pulmonary disease ("COPD") and coronary artery disease, which cause chest pain, shortness of breath, and an inability to stand or walk for extended periods. (Tr. 29-30.) ALJ Chaykin considered these allegations and determined that her COPD, emphysema, and asthma were non-severe, and did not account for any breathing limitations in her RFC assessment. (Tr. 25-26). He also considered her chest pain complaints in limiting her to light work with no exposure to dangerous hazards (Tr. 29-30).

ALJ Chaykin considered the evidence of record and correctly noted that the "objective examination findings during and proximate to the relevant period have revealed clear lungs and no cardiac abnormalities, with normal gait, strength and neurological findings" (Tr. 29) (citing Tr. 469 (November 15, 2018 record documenting clear lungs and no cardiopulmonary abnormality); Tr. 511 (November 5, 2018 record noting "no [respiratory] distress" and normal

13

cardiac exam); Tr. 602 (November 6, 2018 record noting echocardiogram was "technically difficult due to smoking history," but testing showed "good myocardial reserve and no obvious evidence of inducible ischemia"); Tr. 643 (November 6, 2018 record documenting "no evidence of aortic insufficiency"); Tr. 700 (July 7, 2019 record documenting "clear auscultation" and normal cardiac exam); Tr. 1274 (October 2, 2019 record documenting clear auscultation and percussion, bilaterally and normal cardiac exam); Tr. 1304-05 (October 14, 2019 record documenting clear respiratory and cardiovascular exams); Tr. 1311 (clear respiratory and cardiovascular exams on October 14, 2019); Tr. 1367 (clear respiratory and cardiovascular exams on December 2, 2019); Tr. 1437-8 (January 1, 2020 exam note documenting "symmetry of chest wall motion, clear to auscultation bilaterally, no respiratory distress" and "regular [heart] rate and rhythm without murmurs, gallops, or rubs"); Tr. 1467 (January 24, 2020 record documenting "clear to auscultation bilaterally[, n]o wheezes or rhonchi [or] increased work of breathing"); Tr. 1485 (January 30, 2020 note documenting normal respiratory and cardiovascular exams); Tr. 1527 (February 25, 2020 note documenting "no respiratory distress"); Tr. 1617 (May 5, 2020 note documenting clear respiratory and cardiovascular exams); and Tr. 1672 (February 5, 2020 note documenting clear respiratory and cardiovascular exams).

     Notably, Heaton does not cite to any objective evidence of a recognizable respiratory impairment. The undersigned has reviewed the records relied on by ALJ Chaykin and finds that they constitute substantial evidence to support ALJ Chaykin's assessment of Heaton's alleged respiratory impairment. Although the Commissioner argues that Heaton's smoking history should mitigate against a finding a disability, the undersigned did not consider her significant smoking history in weighing the evidence because the medical records document normal respiratory function despite her significant smoking history.

4. <u>Urinary incontinence</u>

Heaton underwent surgery on May 10, 2009, for urinary incontinence and mid-urethral sling placement with Prolene mesh. (Tr. 1097.) Heaton relies on her hearing testimony that she urinated 10 to 20 times a day to challenge ALJ Chaykin's RFC assessment, which did not account for any limitations related to alleged urinary incontinence. (Doc. 22, p. 15) (citing Tr. 50-51). However, like the other alleged impairments discussed *supra*, the medical record does not contain objective evidence to support her allegations, and instead Heaton solely relies on treatment notes that mention her alleged symptoms. (Doc. No. 22, p. 14) (citing Tr. 1273) (October 2, 2019 complaints to Dr. Edemekong of urinary frequency and leakage); (Tr. 1383) (December 5, 2019 complaints to Emily Williams, FNP, and Nurse Williams' assessment of unspecified complication/sequela of implanted vaginal mesh and vaginal irritation). However, as ALJ Chaykin correctly recognized, updated treatment notes do not indicate any diagnosis related to her complaints of urinary frequency, and there is no objective medical evidence supporting her allegations. (Tr. 29, citing 1384, 1480, 1484, 1615). Accordingly, the undersigned finds that ALJ Chaykin's decision not to account for her alleged urinary incontinence is supported by the record.

5. <u>Neuropathy</u>

Heaton also generally challenges ALJ Chaykin's decision to exclude limitations related to her neuropathy in the RFC assessment. She relies on treatment notes that document her complaints of foot pain and swelling to indicate that she cannot perform the RFC assessed. Again, there is no objective medical evidence to establish any manipulative limitations caused by neuropathy, and to the extent ALJ Chaykin recognized mobility limitations, they were

included in the RFC limiting her to a reduced level of light work, and supported by the evidence for the reasons explained *supra.*

## VII. ABILITY TO PERFORM WORK

Heaton challenges ALJ Chaykin's decision at step five that she can perform other work in the national economy. (Doc. No. 22, p. 17.) This point of error essentially repeats her prior complaints that ALJ Chaykin's decision was not based on substantial evidence. This argument also fails because ALJ Chaykin's decision is supported by substantial evidence for the reasons explained *supra.* Moreover, the undersigned recognizes that is no evidence from a treating medical source during the relevant time period that conclusively establishes a level of impairment that entitles Heaton to Social Security disability benefits.

To the extent that Heaton relies on the Commissioner's past administrative decision limiting her to sedentary work to challenge the RFC assessment, that argument also fails. Heaton does not demonstrate a legal duty for ALJ Chaykin to adopt findings from a prior administrative decision. Regardless, her point of error fails because the RFC assessment is supported by substantial evidence. Further, the Act specifically requires that disabling impairments be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques" showing that work-related functional limitations are present and bars an award of benefits based on conditions that cannot be documented. *See* 42 U.S.C. §§ 423(d)(1)(A), 423(d)(3); *see also* 20 C.F.R. §§ 404.1513(a), 416.913(a) (evidence from an acceptable medical source is required to establish a medically determinable impairment). Therefore, in the absence of clinical findings that demonstrate an alleged impairment is present, the agency does not possess the discretion to base a finding of disability on the claimant's reported symptoms. Such determinations are entitled to considerable deference. *James v. Bowen*, 793 F.2d 702, 706 (5th

Cir. 1986). Finally, the burden of establishing the presence of disabling functional impairments is upon the claimant. *See Wren* at 128; *see also Domingue v. Barnhart*, 388 F.3d 462, 463 (5th Cir. 2004) (burden of establishing the presence of a medically determinable impairment with acceptable medical evidence is on the claimant). Heaton has not satisfied her evidentiary burden.

## VIII. CONCLUSION

Although Heaton suffers from a laundry list of chronic ailments, the objective medical record supports ALJ Chaykin's finding that these impairments do not preclude her from working. The undersigned finds that administrative decision is free from legal error and supported by substantial evidence for the reasons discussed in the preceding sections. Consequently, the undersigned recommends affirming the decision denying benefits.

## VIII. OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c), each party to this action has the right to file objections to this report and recommendation. Objections to this report must: (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, and (3) be served and filed within fourteen (14) days after being served with a copy of this report. *See* 28 U.S.C. § 636(b)(1)(c) (2009); Fed. R. Civ. P. 72(b)(2). A party who objects to this report is entitled to a *de novo* determination by the United States district judge of those proposed findings and recommendations to which a specific objection is timely made. *See* 28 U.S.C. § 636(b)(1) (2009); Fed R. Civ. P. 72(b)(3).

A party's failure to file specific, written objections to the proposed findings of fact and conclusions of law contained in this report, within fourteen (14) days of being served with a copy of this report, bars that party from: (1) entitlement to de novo review by the United States district judge of the findings of fact and conclusions of law, *see Rodriguez v. Bowen*, 857 F.2d 275, 276–

77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error, of any such findings of fact and conclusions of law accepted by the United States district judge, *see Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, at 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 10th day of March, 2023.

,

_____
Zack Hawthorn
United States Magistrate Judge